Good morning, Your Honors. Todd Burns, Federal Defenders of San Diego, on behalf of Mr. Watson. I intend to focus my comments today on what I've labeled as the alibi issue. With respect to that issue, the broad finding by Judge Benitez was that Defense Attorney Terry Koelke adequately investigated this case. And a subset of that finding was that Mr. Koelke, either that the alibi was not credible and or that Mr. Koelke had reason to believe the alibi was not credible. Now, because there's no dispute as to the law that's involved, I intend to focus on the facts here. And of course, focusing on the facts, I am of course confronted with clear error review, which normally would be quite daunting. But I think in this case that the record reveals that clear error is manifest. The district court ignored significant parts of the record that were contrary to its fact findings. The district court made findings that were completely belied by the record. And the district court made some findings in certain contexts that seemed utterly irrelevant to what was under consideration. Now I think if the court looks at the record, both at what the State's case presented and at what could have been presented by the defense, that it is obvious that Mr. Koelke's performance, investigation performance throughout was abysmal. Turning first to the State's side of the case, to what the State, what was presented, what could have been presented, what wasn't presented. The State's case, four out of the five charges, hinged on an alleged beating of a James Williams. Mr. Williams was supposedly kidnapped, beaten over several hours and was forced to give up the whereabouts of a gang associate of his, Mr. Atkins, the Now, what Mr. Koelke doesn't seem to realize is that, didn't seem to realize, which was apparent at the evidentiary hearing in this case, was that Mr. Williams was at the scene of the murder. He was there right after the murder. Now, in his statement and in the eventual trial testimony of the two young girls that testified against Mr. Watson, he was beaten severely and dropped off in another part of Oceanside. But lo and behold, he's at the murder scene right after the murder happens. And he gives a statement to police right after the murder happens. And what does he say? He says, I was walking over to this hotel. I saw a thunderbird speeding away. I was walking over to see a woman that I wanted to visit at the motel. I saw a thunderbird speeding away with something like five black individuals in it. At that time, Mr. Williams makes no remarks about any sort of beating. There's nothing in the police report that's done about the statement indicating any sort of beating, that there's blood on him, that there are injuries on him, that he is upset, anything like that. It's only five hours later that Mr. Williams comes up with a totally different story. Now, Mr. Williams is a gang rival of Mr. Watson's. That's acknowledged. Mr. Kolke knows that. Five hours after this initial statement, Mr. Williams has this grand story about, oh, I was kidnapped. I was severely beaten. The people that kidnapped me were in that car. Wasn't a thunderbird. It was a cougar. Nothing more about, I was coming to this hotel just to visit this woman. No, I was coming here, apparently, to find my friend, who I gave up his location, and these people who had beaten me were zooming away. Now, there are some serious problems with Mr. Williams' statements, not the least of which that his story doesn't add up from a forensic perspective. And he supposedly, the women later on testify at trial. He doesn't testify. Mr. Williams doesn't testify. Mr. Kolke, he gave this initial statement that he shows up at the scene. He's at the scene late. Do we know why Williams didn't testify? Well, he was in Federal custody on a cocaine charge, presumably. I don't know exactly why I didn't testify. Mr. Kolke didn't contact him. I talked to his attorney, and he said Mr. Kolke never made any effort to get in touch with Mr. Williams, probably because he was a totally unbelievable witness. His story doesn't make sense. Well, it was never presented in court, so the fact that it doesn't make sense, where does that get you? Well, the importance of it are two things. One is, from a forensic, well, the main part is that Mr. Kolke didn't elicit it. It was among many things he didn't do. He didn't have any strategy. He didn't have any defense. He didn't do anything. He didn't talk to any witnesses. Let me ask you more specifically. You started your comments by saying you wanted to discuss alibi. The district court in this case, after holding an evidentiary hearing, found, among other things, that the alibi was a lie. I mean, I'd put it in more stark terms than the district court did, but the district court heard live witnesses and held that the petitioner and the alibi witnesses were lying and basically that they'd cooked up a story and rehearsed it after the fact. That was the sense I got from reading the district court's opinion. If that is so, where is the prejudice and the Strickland prejudice prong, even assuming that these witnesses had not been talked to or that counsel should have known of their existence from what his client had told him? Taking that as two parts, and I'll try and get to the second part. It's kind of two parts. I'm sorry. It is kind of a convoluted question, but because the court made both findings, that he didn't have adequate knowledge from his client about some of these witnesses, but also they were lying anyway. Yes. The court did do that. But as far as the prejudice, the court never – the court intended to bifurcate the proceeding and deal with prejudice later. The court never dealt with that. But this court's case is a deal. I know, but I'm asking you about it. As far as the credibility determination, I agree with Your Honor. The district court's holding is a little bit unclear. Is the district court finding that the alibi itself was incredible, or is the district court finding that Mr. Kolke had reason to believe that the alibi was incredible? As to the former, I don't think that that's a fair finding because I wasn't permitted to present several alibi witnesses, number one. Number two, it's an appropriate finding because this court, when it – when it looks at prejudice, it looks at the strength of the State's case. It doesn't take the jury's role and say, oh, I would have disbelieved, or the district court's not supposed to take the jury's role, and say, I would have disbelieved those witnesses if they testified. The question is – I can understand why you would disagree with it in this case, but I want to pursue your theoretical point. Let's assume that – that the theory at the ineffective assistance of counsel stage is that I never met the defendant and – I mean, the victim, and I was never at the scene, but there's physical evidence that the person's clothing was covered with the victim's blood, proved by DNA. Can't – can't we or the district court look at that in terms of whether there was any prejudice in failing to allow a defendant to assert, well, I was never there, if there's strong evidence on the other side of that? I mean, you – you seem to be saying theoretically that we could never even get there. I – I – well, the – this Court's case is examining prejudice. Look to was the case – what could have been presented? Generically. Was it – and especially the case of an alibi, it's very strong, as compared to how strong was the case – the Court's – the State's case. And in this case – And you're saying we cannot look at whether the alibi makes any sense or whether it's Well, I think the issue in this case, because the alibi was never presented to the jury, was why didn't defense counsel present the alibi to the jury? No, I understand that. We're – we're not – because I'm looking at the prejudice problem. I understand it was not presented. And that – but I'm assuming now, for the sake of my questions, that it should have been. And don't we still have to assess whether it would have made any difference? Well, perhaps in some cases that doesn't seem to be the trend in the – in the cases that I've reviewed where this Court does a prejudice analysis, it seems to look at just the strength of the government's case. But in this case, that would be an unfair conclusion because there were several alibi witnesses that I was not permitted to call. Who? Mr. Morgan, Ms. LaRose, Ms. Douglas. You found Ms. Douglas? I did. And I submitted a declaration from her. Is that in the record? It is. Where is it? The specific site for her declaration, I'm not sure of right now. I can find that when government counsel is speaking. And let me – as far as the due process here, let me make clear, although the record – because a lot of these hearings, these status conferences, for some reason, were not tape recorded, unbeknownst to me at the time, I clearly indicated to counsel that I requested subpoenas for all those people. That's at 840-43 of the record for White, Yard, Kolke, Morgan, Atwell, and Douglas. I indicated that I wanted to call additional witnesses at 857 of the record. I indicated that I at least wanted to submit a declaration but would like to call LaRose at 928 of the record. At the January 9, 2004 hearing, Judge Benitez made clear that really all he wanted to hear from were Kolke, the defense attorney, and Watson. He didn't even at that point allow me – he was wavering on White. Eventually, he allowed me to call White and Atwell. But no one else. No one else. It was very truncated. And I had to – Wasn't – weren't those the key witnesses for the – for the alibi, failure to invest – adequately investigate the alibi? Well, it's – they were, in some respects, the key witnesses for the performance prong, certainly not for the prejudice. So we never got a chance to – But they were the key witnesses for the performance prong, weren't they, the key witnesses? Yes. And I think from – from the performance prong – Let me ask you this. How would Douglas have fit into that, or Yard? Well, they fit in because they – Are they just sort of peripheral to the – to the heart of the – of the supposed alibi defense? Well, they're – they're more relevant to the – they're certainly relevant to the prejudice prong. Your Honor is correct. They're not so relevant to the performance prong, which is why the reliance – Judge Benitez is saying, well, I didn't find Ms. White to be credible, is somewhat surprising, because Ms. White didn't say that she contacted Mr. Kolke before trial. Ms. White had nothing to say about pretrial knowledge of the alibi. What – what evidenced the pretrial knowledge of the alibi were Mr. Atwell, the defense investigator's September 16, 1997, report indicating that there were potential alibi witnesses, Douglas and LaRose, and Mr. Kolke's own notes from his own file. Now, Mr. Kolke in his answers to the Court's interrogatories and supplemental interrogatories never says anything about those individuals. Only when he's on the stand, only when it comes to cross-examination does he say, oh, well, I might have heard something about LaRose. And he continues to deny a cross-examination, knowing anything about Bobby Douglas, until I pull out his notes and say, well, what – what's going on here? Here are notes indicating she's an alibi witness, too. Oh, well. He doesn't have an excuse for that. And – and so those two are real key. He's caught in a bind on LaRose and Douglas. And the district court gives him an out that he didn't – that he didn't take. The district court says, well, as to Douglas, she couldn't be found. Well, the only indication we have is Mr. Atwell's September 16, 1997, report indicating that he went looking for a Bobby Douglas, but he thought Bobby Douglas was a man and he couldn't find him. What does Mrs. Douglas say in her declaration? She corroborates the alibi. And that's – that declaration is one of the declarations – No, as I said, peripherally, though, only up to a point, correct? I don't – you don't want to overstate it. She corroborates the alibi from the prejudice perspective. She doesn't say that I talked to Mr. Kolke before trial. That's evidenced by Mr. Kolke's own – that his knowledge of her is evidenced by his own file in Atwell's report. But she corroborates that Mr. Watson stopped by her place with Mr. Morgan that evening and then – and then left. And then – so that's – that's his alibi, is I left Oceanside with Mr. Morgan, we stopped by Ms. Douglas's, and then we went to this party where I met up with Paula White and spent the night with Paula White. So she corroborates an important part of the alibi. But he's – Kolke's caught there and he's caught in so many other aspects, too. He gets up and he lies about his history of discipline, discipline essentially by this court for not representing his client, not responding to the court, being found to have committed perjury by the California Court of Appeals and being fined $1,000, being sued for committing fraud in the sale of his wife's house, being sued by another client for failing to represent – another client's mother for failing to represent that client. He – he lies about all that, too. And he gets up and he says in the evidentiary hearing, you know, I – I didn't put Paula White on trial. Paula White told me she was lying. In the – in the trial court, he submitted her declaration. Then he submitted her signed declaration two days before the post-trial hearing. Then he submitted his declaration the day of the post-trial hearing authenticating her declaration. Then he got up there and he argued the point, that – that she would have given this testimony if he had known about her and she had been called. So he's either perjuring himself in the state court or he's perjuring himself in the federal How much credibility does a man get to burn before he loses it? Because this guy, it would seem to me, had lost it a long time ago. Now, as far as the issue, he clearly knew about Douglas and LaRose, and there's no good answer for those. He doesn't have any good answer for those. The district court doesn't have any good answers for those. So let's look at White. He knew about White, too. Aside from the fact of his inconsistencies, his changing stories, his lies, he knew about White. And there are a few things that really show that. Now, one is, White contacted Mr. Kolke in mid-July of 1999 and said, look, I've read about this murder case. I was with him. I want to help. This is post-conviction. July 31st, 1999, and this is at the excerpt 1304 to 1305, Mr. Watson writes to Mr. Kolke and says, you know, you're pursuing this motion for a new discovery of a new evidence of Ms. White. Please make sure you tell the district court, the trial court, why we couldn't find her, because she was outside the country, or she was outside the State. Now, that indicates his understanding. Kolke's gone to him and told him that. Oh, that's why I couldn't find her. That's why I never found her before. That's why we didn't put her on, because she's outside the State. Does Kolke respond to that and say, hold it a second. No, the reason we couldn't find her is because you didn't tell me about her. Now, we didn't do that. And if what Mr. Watson had written to him was untrue, he, of course, would have done that. If I had a letter from a client of mine saying, oh, you didn't put on a defense for me because X, and X was untrue, you can be absolutely sure I would respond and say, hold on a second, because then that gets to the point where he's drawing me into something dishonest or essentially bringing me into a position where it looks like I have committed ineffective assistance to counsel. I, of course, would respond. Mr. Kolke didn't respond. Second, Mr. Kolke takes the position when he submits this motion for a new trial that the reason that it wasn't submitted earlier is because Mr. Watson didn't remember where he was. Well, that's just ridiculous. And what he says, well, Mr. Watson didn't remember where he was, is because he was first arrested several months after the murder. Government counsel gets up at that hearing and says, that's ridiculous. He was actually first arrested, first confronted in jail a week or two after this, after the murder happened. The relief you seek is a remand for an additional hearing on the IAC issue? Well, certainly that would be helpful to put on everything if there's going to be some sort of finding that the prejudice wasn't met because these people, because the alibi was unbelievable or incredible. But I think, I don't know that I could establish much better that Kolke knew about this alibi and that he didn't do anything. He didn't do anything throughout this case. He didn't file any motions. He didn't request any jury instructions. He didn't read the discovery to know that Williams was there at the scene of the murder. He didn't get any forensic testimony to point out that this whole story of him being beaten bloody and having blood all over him, but no blood being found anywhere, didn't make any sense. He didn't even bring out the State's forensic evidence, which was that all these things, the shirt, the shoelaces that were supposed to be used to tie Mr. Williams, all these things were all tested. That's in 1460 to 1430 of the excerpt of record. All these things were specifically tested. He brings out generically through this detective, oh, the crime technicians came out to the very scene and whatever. He doesn't go through, look, they tested this cable leg that the guy was supposedly beaten bloody with. They tested the inside of the fabric of the car. They tested the shoelace. They tested the shirt that was supposedly used. No blood. No blood on him when he arrives at the scene. No blood on anything. No gunpowder residue anywhere. This story stinks. It does not make any sense. Roberts. Do you want to save some time for rebuttal? Yes, please. Thank you. We'll hear from the Warden at this time. Mr. DaSilva. Good morning, Your Honors. May it please the Court, Anthony DaSilva, Deputy Attorney General, and the Respondent. Mr. Berger has argued that there have been inconsistencies in changing stories, but those inconsistencies in changing stories have come from modification, not only at the trial court level, at the appellate court level, at the district court, but even before this court in a modification of some of the claims that he's made. If I may briefly address the issue of witnesses, the district court gave the parties ample opportunity to conduct discovery if they wanted to, to name the witnesses they wanted if they wanted to. And the only witnesses that Mr. Burns at one point claimed that he wanted to call, and I believe it's attached to our reply in our motion to strike the declarations, were Paula White, Christy Yard, Mr. Kolke, John Atwell, and Derek Morgan, who ultimately he decided not to call Mr. Morgan. The Court never dissuaded anyone from not calling a witness. What the Court was concerned at the end was that we were continuing to have a trial within a trial that was getting out of control, out of hand. The Court had heard all of the evidence it needed. We had two days of evidentiary hearing. And after that hearing, the Court, considering all of the evidence, considering the discussions between Watson and Kolke and the work of the investigator, Mr. Atwell, who investigated numerous witnesses, including two, April Davis and Mimi Haley, who witnessed the murder, put him at the scene that would have resulted in the death of Mr. Atwell. The Court decided that Mr. Watson's alibi was not credible, that Mr. Watson and that Ms. White were not credible, and that their testimony seemed rehearsed. Roberts. I want to make sure I understand something very clearly. So make your answer precise, and if you don't know, tell the panel that you don't know. Are you telling us that you don't know? I don't recall. I recall at pretrial we had, or pre-hearing, we had some witnesses. I do not recall Bobby Douglas's name coming up during the pre-discussions. I do know that later on the earlier argument, you rattled off a list of witnesses that he told the Court he wanted to call, correct? Correct, Your Honor. And Bobby Douglas's name was not among them. I cannot recall Bobby Douglas's name being one of those witnesses. No. In your argument here today in Pasadena, California, two minutes ago, you rattled off a list, right, of witnesses that Mr. Burns wanted to call at the evidentiary hearing, and you rattled off a list of four or five names, and that at the end of the day, one name he decided not to call. I think before the hearing he decided not to call, even in advance of the hearing. In my understanding, if I recall correctly, the only witnesses who were going to testify at the hearing were going to be Paula White, Mr. Kolke, and Mr. Atwell. Where's that documented in the record? Well, in addition to at the evidentiary hearing itself, when – Usually before the hearing, you know who you're going to call. Yes, Your Honor. Usually. It's not necessary. I mean, but usually you let the district court – there's an order from the district court or a designation of witnesses or something. I believe in our reply to the motions to strike, I attached a letter by Mr. Burns as to who he intended to call, and those were the names that were indicated. You tried this case for the warden before the district court? Yes, I did, Your Honor. Well, you understand my concern, to be clear about it. Sure. Mr. Burns has told us that there were witnesses he told the court he wanted to call, alibi witnesses, and he was not allowed to call them, and you're telling us that's not so. I don't recall the district court ever saying you cannot call someone. Early on, I believe at the end of the hearing, when they wanted to expand it further, the court had heard from all the witnesses, and at that point, there was even a stipulation that was inquired about, and the stipulation was entered into a factual stipulation, further ones. That ended the hearing, and then we submitted the further briefing, Your Honor. See if I understand your answer, because I'm having a little bit of trouble following it. If I understand your answer correctly, you're saying that before the evidentiary hearing started, the witness list was White, Yard, Morgan, whom we decided not to call, Colkey, Atwell, and Watson, and then later at the end, there was a later sort of post hoc request to include Douglas and LaRose, and that's when the trial court said, no, it's too late. I've heard everything I need to hear. Is that what you're saying? I believe that's correct, Your Honor. Yes. Okay. But was there an order from the district court before the hearing saying you must designate your witnesses? We had actually submitted a memoranda, which included some of our witnesses, and I believe that's included in the record, but there was no specific order. You must designate your witnesses. I'm sorry. I'm still confused. Are you now telling us that Mr. Burns indicated before the hearing that he wanted to call a list of witnesses, correct? Yes, Your Honor. And he wound up, in fact, calling all of those save one. Correct. And that decision was his decision not to call the witness, correct? I believe so, Your Honor, at that point, yes. Yeah. And at the end, he then asked the court if he could call one or two more witnesses? I think he wanted to put Watson and Atwell on the stand again and maybe wanted to add more witnesses at that time. And the State opposed that? Yes, Your Honor. And did that request include Douglas? I don't recall that, Your Honor. I do recall it. Recall it one way or the other? I don't recall that one way or the other. I thought at that point that we had presented all the evidence, the hearing would be concluded, and we would have the post-hearing memoranda submitted to the court. At that point, did the district court have the Douglas declaration? I am not sure, Your Honor. If I recall, that declaration was submitted with the post-hearing briefing. Okay. All right. I think I'm clear on that. I'm sorry if I have confused you. No, no, no. No, it's not sure. I was confused between the two. But unless the Court has any further questions, we would submit on the briefing. I don't see any. Thank you. Mr. Burns? Part of the problem, of course, here is that for some reason there was no record kept of these various status conferences, five of them which were held telephonically. This is not meant at all to be argumentative, but whose responsibility is that? The first time that I realized that one wasn't being kept, I raised it with the district court and said that I want these hearings to be on the record. The next one was on the record. Five after that or four after that were not on the record. I had no idea. I assumed we were in a court of record. I had requested it that it was being done. But nevertheless, this is what happened. I requested, and this is at 843 of the record. Before the January 9th hearing of 2004, when Judge Benitez indicated who he would hear from, I requested to be able to call certain witnesses. That included Derek Morgan. That included Chris Yard. That included Bobby Douglas. It's right on 843. It's in my request. That was before the January 9th hearing. I also submitted papers indicating that I may seek to call other people, including or no, I indicated at the hearing that I may seek to call other people as I find them, including LaRose. I specifically told the judge at the hearing, and that is in the record at 857 and 928. Judge Benitez said he didn't want to hear from anyone else. It was obvious he only wanted to hear from Kolke and Watson. He eventually allowed me to call Atwell and White as well. But he made that quite clear at the hearing at 955. It's ER 955 to 957. Faced with that, and faced with the very limited time that he gave me for this hearing, I knew I wasn't going to be able to call other people. I didn't have them subpoenaed. He wasn't going to hear from them. I did, however, go out and get declarations from a number of people that I found to be relevant. Number one, because I knew Kolke was going to say stuff that was a lie about turning over the investigation to Atwell, and Atwell going to see Mr. Watson in jail. Also, I got stuff from people at the jail refuting that. I got the declaration from Bobby Douglas establishing the alibi. I had that stuff. It's all predated from the date of the hearing, from the April 2004 hearing. It's predated. I had it with me at the hearing. When we got to the end of the hearing, which was at 6 o'clock on a Friday, I said, look, I want to give you this other stuff because I haven't been able to call these witnesses.  He was rushing me through the end of the hearing. I had the Bobby Douglas declaration predated. I had many of those other declarations predated. If I had been permitted to call her, I wouldn't have had a declaration predated. I would have had her there. I would have subpoenaed her. I'm not that dumb and I'm not that lazy. I would have had her there. He wasn't letting me have her there. But all this is a little bit kind of beside the point from the performance perspective, which is that the evidence was overwhelming that Mr. Kolke didn't do anything, including on the alibis. And one thing that I find, it really, the Court can probably tell I get a bit emotional about this case because I'm just amazed at the level of ineffectiveness and that Mr. Kolke did nothing in this case and dissembled about it. But it really kills me to hear that the Court, the district court has accepted part of his explanation was that Mr. Kolke said, well, I didn't call Haley, even though I had a written statement from her saying that Mr. Watson wasn't there, exonerating Mr. Watson. I didn't call her because she later said, I saw Watson commit the murder. So that's why I didn't call Haley. That is absolute nonsense. According to the government's case, according to all the witnesses involved, Haley went home early. She went home about midnight. No one ever contended Haley was at the scene of the murder or saw the murder committed. Nobody ever. Kolke made that up on the fly on the stand because he had to come up with some reason as to why he didn't call someone that he had a written statement from exonerating Mr. Watson. Why didn't he call her? Because he was lazy. He also didn't call Tumala. Why didn't he call Tumala? He said, oh, well, the second time I sent my investigator to her, even though she had given him a written statement exonerating Mr. Watson too, she then said she wouldn't cooperate. That doesn't make sense either. He was saying to the judge, up until the second day of trial, I'm going to call Tumala. I'm going to call Tumala. And then he didn't call her, and his reason was, oh, her attorney now has told her to invoke. He never brings her to invoke. He never requests immunity, even though the prosecutor had offered a few days earlier to grant her a mutiny. He never requests to conclude, to preclude the government's witnesses. All of what Mr. Kolkis said. I know. I'm sorry. He is wound up. I thought you wanted me to unwind myself. Thank you for your argument. Thank you very much. Thank you. Appreciate it. The case just argued will be submitted for decision, and the Court shall stand adjourned for this session.
judges: Hawkins, Graber, Paez.